KATHRYN DIAMOND[1] *vs.* ARTHUR PAPPATHANASI[2] & others.[3]

No. 09-P-1386.

Suffolk. March 8, 2010. - October 15, 2010.

Present: McHUGH, MILKEY, & HANLON, JJ.

*Partnership,* What constitutes, Dissolution, Derivative action, Fiduciary duty, General partner, Limited partnership, Accounting. *Practice, Civil,* Waiver, Standing, Damages, Attorney's fees, Interest. *Damages,* Attorney's fees, Interest.

Financial reports and tax returns that referenced a limited liability company (LLC) as a partner in a general partnership were not sufficient, standing alone, to establish the LLC's membership in the partnership or to estop other general partners from denying that membership. [85-86]

In the circumstances of a civil action brought by a member of a general partnership (plaintiff) against, inter alia, three other members (defendants), in which the plaintiff sought reallocation of the shares of the partnership due to the defendants' violation of the partnership agreement by acquiring the interests of four family members who voluntarily left the partnership, the judge did not err in declining to reallocate the partnership shares, where the plaintiff failed to prove that she was harmed by the purchase of the departing members' shares. [86-87]

In the circumstances of a civil action brought by a member of a general partnership (plaintiff) alleging derivative claims against, inter alia, three other members (defendants), this court concluded that, although the plaintiff failed to satisfy the verification and presentment requirements applicable to derivative claims by operation of Mass. R. Civ. P. 23.1, the defendants waived those issues by failing to raise them in a timely manner. [87-92]

In the circumstances of a civil action brought by a member of a general partnership (plaintiff) against, inter alia, three other members, the judge did not err in dismissing the plaintiff's derivative claim seeking recovery for harm indirectly done to the partnership through the alleged diminution of assets of a related entity (a limited partnership of which the general partnership was a member), where the plaintiff failed to demonstrate a sufficiently

---

[1]Individually and on behalf of Scangas Realty Associates, 330 Scangas Limited Partnership, and Scangas Realty II Limited Partnership.

[2]Individually and as trustee of 330 Scangas Nominee Trust.

[3]Nicholas Scangas, individually and as trustee of 330 Scangas Nominee Trust; Christopher Scangas, individually and as trustee of 330 Scangas Nominee Trust; 330 Scangas, Inc.; Scangas Management, Inc.; Harriett Maistrellis; Pamela Scangas; Patricia Scangas; and Arthur Scangas.

direct interest to have standing to maintain a derivative action on behalf of
the related entity. [92-94]

In the circumstances of a civil action brought by a member of a general
partnership (plaintiff) alleging derivative claims against, inter alia, three
other members (defendants), the trial judge, in finding several specific
instances of self-dealing on the part of the defendants, applied an appropri-
ate level of scrutiny to the plaintiff's claims and provided all the account-
ing to which the plaintiff was entitled [94-97]; further, the judge did not
err in ordering the defendants to reimburse certain management fees that
they had paid to themselves [97-99], properly exercised his discretion in
deciding not to entertain the plaintiff's separate application for attorney's
fees [99], and did not err in awarding prejudgment interest only from the
date the complaint was filed [99-100].

CIVIL ACTION commenced in the Superior Court Department on
September 1, 2004.

The case was heard by *Allan van Gestel*, J.

*Thomas S. Fitzpatrick* (*Thomas Frisardi* with him) for the
plaintiff.

*Jeffrey J. Upton* for the defendants.

MILKEY, J. This appeal involves a distressingly familiar scenario:
the development of a successful family business enterprise by
one generation, followed by a bitter intrafamily battle over owner-
ship and control in the next generation. At the center of the cur-
rent litigation is Scangas Realty Associates (SRA), a general
partnership that four siblings formed in 1973. The plaintiff is the
daughter of one of SRA's founding members. As of the date of
trial, the plaintiff was herself a member of SRA, as well as a
limited partner in a related entity. She alleged that three of her
cousins, who had day-to-day control of the relevant entities,
engaged in a variety of misdeeds that harmed her and the entities
in which she had ownership interests. She brought this derivative
and direct action against the defendants, who include three of her
cousins (Arthur Pappathanasi, Nicholas Scangas, and Christopher
Scangas, collectively, the primary defendants), four of her other
cousins (joined largely as nominal defendants), and certain enti-
ties controlled by the primary defendants.

After a seven-day jury-waived trial in the business litigation
section of the Superior Court, the judge ruled in favor of the
plaintiff on some of her claims and against her on others. He
entered a judgment, as subsequently amended, that required the

primary defendants to reimburse SRA and a related entity $403,026.27 (plus interest to run from September 1, 2004, the date the complaint was filed). In the amended judgment, the judge also made various declarations, including: (a) that the partnership interests in SRA remain unchanged, and (b) that the amendments to the SRA partnership agreement were valid. He dismissed all other claims, including the plaintiff's request for an accounting.

On appeal, the plaintiff accepts all of the judge's findings but argues that these findings demonstrate that she was entitled to additional relief. She also argues that the judge erred in not modifying the partnership interests, in declaring that the amendments to the SRA agreement were valid, in not entertaining her request for attorney's fees, and in setting the date on which interest began to accrue. On cross appeal, the defendants argue that the judge erred in awarding the plaintiff any damages, both on jurisdictional grounds and on the merits. We affirm.

*Background.* 1. *The creation of SRA.* This dispute involves, in addition to SRA, a complicated array of related entities, including several corporations, limited partnerships, limited liability companies, and trusts of various sorts. Although we need not lay out a full taxonomy of these entities, some background is necessary.

Many decades ago, three brothers (Paul N. Scangas, Angelo Scangas, and James Scangas) and their sister (Georgia Pappathanasi) founded a variety of businesses, which were held in various corporate forms, located mainly in Essex County. The largest of these businesses was a dairy enterprise known as the West Lynn Creamery (creamery). In addition to operating such businesses, the siblings invested in commercial real estate. It is this latter side of the family enterprise that is mainly at issue in the current litigation.

As the first generation aged, some in the younger generation took an increasingly active role in the family business. The rising star was defendant Arthur Pappathanasi, who began working at the creamery at age twelve and who eventually became its president and chief executive officer. Pappathanasi was a close protégé of his uncle, Paul N. Scangas, who was the father of the plaintiff, Kathryn Diamond.

In 1973, the four siblings formed SRA, a general partnership founded under Massachusetts law, to operate the real estate side of the family business. SRA's original members included the four siblings, their spouses, and their eleven children, for a total of nineteen members in all. Each of the partners received an equal share of the partnership (slightly more than five percent).

2. *Changes in SRA ownership and control.* The membership of SRA declined over the years as many of the original nineteen members died or voluntarily withdrew. The partnership agreement provided that, in either event, SRA was to cash out the departing member's interests by paying him (or his estate) a "liquidating share." As members began to die, however, the remaining partners never actually followed this provision. Instead of the deceased member's interests being redeemed, those interests were transferred to the deceased member's branch of the family (thus increasing the proportionate share of those members who received the transfer, while leaving all other members' proportionate shares unchanged). This did not alter any member's voting rights, because each member had one vote under the partnership agreement.

Paul N. Scangas (the plaintiff's father) died in 1987, and his interest was treated in the same manner as those of the members who had died before him: his widow's interest doubled to reflect both her and his interests. In 1997, one decade after Paul's death, his own family created a limited liability company known as the Paul N. Scangas Realty LLC (PNSR) to hold the interests he had held in the various family businesses. After his estate was finally settled, his interest in SRA was transferred to PNSR.

The day-to-day operations of SRA were run by a three-person investment committee.[4] At the time of SRA's formation, that committee included Paul N. Scangas, defendant Arthur Pappathanasi, and defendant Nicholas Scangas. At least by 1993, and continuing to the present, the investment committee has been composed of the three primary defendants (Arthur Pappathanasi, Nicholas Scangas, and Christopher Scangas). In 1995, the primary defendants created two new entities related to SRA.

---

[4]There were also officers named, although in practice the investment committee members and the officers were the same individuals.

One was 330 Scangas Limited Partnership (330 Scangas LP), whose sole limited partner is SRA and whose sole general partner is 330 Scangas, Inc., a corporation run by the primary defendants. The other entity was the 330 Scangas Nominee Trust (trust), whose sole beneficiary is 330 Scangas LP, with the three primary defendants as its trustees. By this time, SRA and its two new related entities had stopped purchasing new properties, and their business was limited to managing existing commercial properties.

In 1998, the family sold the creamery to Suiza Foods Corporation (Suiza). The sale of the family's principal business occasioned a great deal of family friction and various pieces of actual or threatened litigation among the cousins. Two of the cousins, Janice Scangas and Joyce Scangas, insisted that their interests in SRA be cashed out as part of the sale. After a lengthy appraisal process and extended negotiations, the sale of their interests was finally consummated in 2001. Although the original plan had been for SRA to redeem Janice's and Joyce's interests, this plan was changed at the insistence of their father, James Scangas, one of the founding members of the partnership.[5] Instead of SRA as a whole buying out the interests of Janice and Joyce, the primary defendants and the other four individual defendants purchased the interests directly (thus increasing their respective shares). These same seven individual defendants also purchased the shares of James Scangas and his wife in 2003. Other details regarding these purchases are discussed further, *infra*.

3. *The plaintiff's efforts to gain more information and control.* Prior to the sale of the creamery, SRA partnership meetings were held at the same time as the corporate meetings of the affiliated family businesses. After the sale, the partnership meetings essentially ceased, and the primary defendants ran the business with little involvement from other family members. The role of the other members was limited to that of passive investors who received annual reports, occasional telephone consultations, and periodic distributions. Their limited role was not entirely of their own choosing. The plaintiff in particular was unhappy that her

---

[5] The record suggests that James Scangas, who was soon to leave the partnership himself, did not want to put any additional money into SRA or to have the assets of SRA diminished by his daughters' cashing out their interests.

branch of the family had no representation on the SRA invest-
ment committee.

As the plaintiff acknowledged at trial, she knew very little
about the operations of SRA as of the fall of 2003. To educate
herself, she began to make a series of escalating demands for
information. The response by the primary defendants was mixed.
Although they cooperated with her to a great extent, they con-
tinued to hold some information close to the vest. Some of their
responses were less than complete and arguably misleading. It
bears noting that family relationships were particularly strained
at this time. The primary defendants were focused on other
pressing legal matters related to the creamery, and they were of
the view that the plaintiff was trying to take advantage of their
situation. Armed with the information that she was provided,
the plaintiff became convinced that there were improprieties in
how the primary defendants were running the various entities in
which she held interests.

As tensions increased, the primary defendants called an SRA
partnership meeting for July 21, 2004, the first such meeting in
several years. One of the purposes of the meeting was to discuss
possible dissolution of SRA. That option never took off, how-
ever, because of the perceived tax implications. Faced with the
knowledge that the plaintiff believed that there were impropri-
eties, the primary defendants had one of their allied family
members propose a motion to ratify all the past actions of the
investment committee since the last partnership meeting. On
that motion, and on another, the plaintiff attempted to cast two
votes, one for herself and one for her father (who had died seven-
teen years earlier). The ratification motion received seven votes
in favor, two votes opposed (not including the plaintiff's second
vote for her deceased father), and one abstention.

Without first providing any formal prelitigation demand, the
plaintiff filed suit on September 1, 2004. While the suit was
pending, defendant Arthur Pappathanasi convened special meet-
ings of the partnership in December of 2005 and January of
2006 to amend the partnership agreement to allow existing
members to be expelled by a two-thirds vote. The undisputed
purpose of the proposed amendment was to expel the plaintiff,
her sister, and her mother. At the meetings, the plaintiff again

sought to cast two votes, this time one for herself and one for PNSR. Whether a second vote should be counted is critical because the plaintiff needed that vote to block the two-thirds majority necessary to amend the partnership agreement.

Relatively early in the litigation, the defendants offered to have an independent auditor examine the relevant financial records, and they pressed the plaintiff to agree. After the plaintiff refused this offer, the defendants unsuccessfully moved for the appointment of a special master for this purpose.

4. *The alleged improprieties.* At trial, the plaintiff produced evidence of various improprieties. One involved the settlement of litigation that Suiza brought in 2001, alleging fraud related to the sale of the creamery. In the fraud action, Suiza sued the primary defendants and some of their attorneys. The parties to that case settled in June of 2004. As part of the settlement, Suiza received a significant reduction in the rent it owed the trust for use of the creamery building (which the trust retained after the sale of the creamery, and rented to Suiza). The rent reduction amounted to $2.5 million over the life of the lease. In the current action, the plaintiff alleged that the primary defendants improperly used the trust's assets to fund the settlement of a claim that had been brought against them personally.[6] After the initiation of the current action, the primary defendants quickly made amends by agreeing to reimburse the trust for the lost rent. The parties disputed at trial whether this was a result of the plaintiff's action or something that the primary defendants always had intended to do.

The primary defendants paid themselves management fees for running SRA despite the fact that the partnership agreement expressly prohibited such fees. The judge rejected their arguments that they were otherwise entitled to such fees and ordered them to reimburse the monies paid ($172,500). He did not order them to reimburse the separate management fees they charged for administering the trust because he concluded that the plaintiff lacked standing to press those claims.

The plaintiff presented evidence of a variety of other improprieties, and the judge credited much of this evidence in his

---

[6] The trust was originally a defendant in the fraud case, but had been dismissed the previous year.

findings. The most serious allegations involved a $3.3 million loan the defendants alleged that they had made to the trust. The plaintiff disputed that they had in fact loaned all that money. After struggling to sort out the piles of undigested financial information that the parties had provided, the judge concluded that the defendants had failed to demonstrate that $1.85 million of the loan was in fact made to the trust. In the end, however, the judge concluded that the plaintiff lacked standing to allege fiduciary breaches relating to the trust, and declined to order any relief regarding the loan.

The plaintiff also challenged the manner in which the defendants managed the loans they had made to SRA and the trust. The judge found that the defendants left those loans unpaid, accruing high rates of interest, while using available funds to pay off lower interest loans made by others or simply leaving such funds in the bank. The judge also found that the primary defendants to some extent had commingled personal and SRA (or trust) assets, for example, by using assets belonging to SRA or the trust as collateral to secure loans for personal investment ventures. Finally, the judge found that the primary defendants authorized payments from SRA or trust assets for various purposes that the plaintiff alleged provided only personal benefits to the primary defendants, including contributions made to electoral candidates or charities that they favored, and payments made to less fortunate family members and select former employees.

The judge ordered the primary defendants to reimburse SRA for various items, in addition to the management fees discussed, *supra*. These additional items totaled $193,526.27. The only item that the defendants still dispute was an $86,059.73 payment that the judge concluded should have been made to SRA instead of to Richdale Dairy Stores, LLC (Richdale), a company owned by the primary defendants.

5. *Scangas II.* Most of the transactions at issue in this case involved SRA interests in one capacity or another. However, some involved a separate commercial real estate entity known as Scangas Realty II Limited Partnership (Scangas II). The family formed Scangas II in 1985 as an estate planning tool, that is, as a mechanism to pass some of the family wealth directly to

the next generation. The limited partners of Scangas II were solely members of the younger generation, and the general partner was Scangas Management, Inc., another company run by the three primary defendants. Scangas II did not supplant SRA, but existed as a second, smaller entity alongside it. The plaintiff's allegations and evidence regarding Scangas II largely paralleled hers regarding SRA. The judge required the primary defendants to reimburse Scangas II $37,000 in management fees that they had charged, but he did not otherwise provide the plaintiff relief regarding Scangas II.

*Discussion.* We address first those claims the plaintiff brought in a direct capacity, beginning with the contest over the partnership status of PNSR. As noted, *supra*, that issue is at the center of the parties' dispute, because the plaintiff can block the other partners' efforts to expel her from the partnership only if she can rely on PNSR's vote.

1. *Status of PNSR.* As courts have long recognized, the ability of partners to choose with whom they want to associate is fundamental:

> "An inherent quality of an ordinary partnership is that its membership is limited to those who are selected by mutual consent on account of their ability, integrity and other personal qualifications to join together in conducting a commercial undertaking. Freedom of choice of those who are to compose the partnership is the right of each of those who are contemplating the formation of the firm, and after it has been organized a similar freedom exists in determining the admission of new members."

*State St. Trust Co.* v. *Hall*, 311 Mass. 299, 302 (1942). To effectuate that principle, the SRA partnership agreement provided that a member's partnership interest terminated upon the member's death, and it included strict rules as to how any new partners could be added. The judge concluded that the plaintiff failed to show that any of the requisite procedures were followed, and the plaintiff does not challenge that conclusion. The plaintiff instead relies on some financial reports and tax returns that reference PNSR as a partner. However, these documents, while curious, are not enough to establish PNSR's membership

in the partnership, or that the defendants are somehow estopped from denying that membership.[7] See *Turnpike Motors, Inc.* v. *Newbury Group, Inc.,* 413 Mass. 119, 123 (1992) (listing elements of estoppel as representation, reliance, and detriment). For example, the plaintiff has not demonstrated that she reasonably relied to her detriment on the references to PNSR as a partner. Accordingly, the judge properly concluded that PNSR never became a member of SRA.[8] It therefore follows that the vote taken to amend the termination provision of the partnership agreement passed by the necessary two-thirds vote.[9]

2. *The defendants' purchase of other partnership interests.* The plaintiff argued that the defendants violated the SRA partnership agreement when they acquired the interests of the four family members who voluntarily left the partnership, instead of having the partnership redeem those interests. By way of remedy, she sought to have the shares of SRA realigned to reflect the higher proportion she would have held had the departing members' shares been redeemed. The judge rejected this claim without explanation.

The defendants argue with some force that the plaintiff acquiesced in some of the transactions and that she is barred by laches from challenging them.[10] We need not rest on grounds of acquiescence or laches, because the plaintiff's case fails for a

---

[7]Nor does the fact that the plaintiff purported to cast a vote "for her father" at the 2004 meeting estop the defendants from questioning PNSR's partnership status now. In fact, it is far from clear that she, as opposed to PNSR itself, has standing to raise the treatment of PNSR. The defendants have not pressed this point.

[8]It is undisputed that if PNSR is not a member, then SRA would owe the plaintiff's father's estate compensation for his interest. At oral argument, the parties represented that SRA had tendered such compensation. The propriety of that compensation is not before us.

[9]The parties reported that the SRA partnership did in fact vote to oust the plaintiff after judgment entered. They also reported that SRA has paid compensation to the plaintiff to redeem her share. The propriety of those actions is not before us, and the parties indicated at oral argument that any potential litigation as to the amount of the "cash-outs" would await our resolution of the current appeal.

[10]As to those transactions that took place in 2003 (the purchase of the shares held by James Scangas and his wife), the testimony suggested the plaintiff was offered the opportunity to participate in the transactions and declined to do so (without raising any objection to the defendants' own purchase). As to the 2001 transactions (the purchase of the shares held by Janice

more basic reason, her failure to prove any damages. The individual defendants' purchase of the departing members' shares did not affect the plaintiff's percentage ownership interest; she had the same percentage (5.263%) before and after the transactions. Contrast *Demoulas* v. *Demoulas Super Mkts. Inc.*, 424 Mass. 501, 505 (1997) (defendants used wrongful means to acquire greater ownership interest in family-owned company "at the expense of [other] members of [the] family"). While it is true that the plaintiff's percentage interest would have increased (to 6.666%) had the individual defendants followed the redemption procedures in the partnership agreement, this would have been a higher percentage of a pool of assets correspondingly diminished by the redemption.[11] In the end, the plaintiff failed to prove that she was harmed by the purchase of the departing members' shares. We discern no error in the judge's declining to reallocate the partnership shares.[12]

3. *The derivative claims.* Most of the plaintiff's claims assert that the defendants harmed her through dissipating the assets of the entities in which she held interests. Such claims properly are characterized as derivative claims, a conclusion that the

Scangas and Joyce Scangas), it appears uncontested that the plaintiff learned about the transactions at least by the spring of 2002, but did not complain about them until years later when she filed her suit. There was conflicting testimony regarding whether the defendants notified the plaintiff of the sale before it occurred, a factual dispute that the trial judge never definitively resolved.

[11]Alternatively, a redemption could have been funded through the infusion of new cash from all the remaining SRA members, in which case the partnership assets would not have been reduced, but the plaintiff would have had to pay out of her own pocket for her increased share. The plaintiff highlights that the judge found that she and her sister and mother "each received $60,715 less in SRA distributions than they would have received had the [departing members'] interests been redeemed." But this addresses only one side of the ledger. She never offered proof of what the net change would have been if one were to take into account the depletion of SRA assets (or the infusion of new capital from remaining SRA members) that necessarily would have occurred had the departing members' interests been redeemed. The judge specifically found that she failed to demonstrate damages on her direct claims.

[12]Nor do we see error in the judge's refusal to require the defendants to reimburse SRA for the expenses related to the sale, e.g., the costs expended in appraising the interests of Janice Scangas and Joyce Scangas. As noted, Janice and Joyce insisted that their interests be cashed out as part of the sale of the creamery (a transaction through which the plaintiff herself profited handsomely), and the plan until the very end had been for SRA to redeem those shares.

plaintiff does not contest. Before reaching the merits, we must address whether those claims were properly before the judge.

a. *Jurisdictional issues.* The plaintiff brought two distinct types of derivative claims related to SRA.[13] Grounded principally in count I of her amended complaint, the plaintiff sought to recover for SRA damages for the harm that she alleged the defendants directly caused SRA through their handling of SRA business. There is no question that the plaintiff, as one of SRA's members, had standing to bring such a derivative claim; the question with regard to that claim is whether she otherwise complied with the procedural requirements of bringing a derivative action (e.g., the pleading requirements of Mass.R.Civ.P. 23.1, 365 Mass. 768 [1974]).

Grounded mainly in count II of her amended complaint, the plaintiff also sought to bring a derivative claim to recover for harm indirectly done to SRA (and derivatively to its members) through the alleged diminution of the assets of 330 Scangas LP (of which SRA was the limited partner). That derivative claim, which she sought to bring on behalf of 330 Scangas LP, involved her allegations that the primary defendants violated fiduciary duties with regard to their management of the trust's business. This derivative claim raised an additional layer of jurisdictional issues, because the plaintiff herself held no direct interest in the limited partnership on whose behalf she sought to sue. We address in order the issues raised by the two different types of derivative claims.

(i) *Derivative claim for harm done directly to SRA.* The defendants argue that count I (and related portions of other counts) should have been dismissed because of the plaintiff's failure to comply with the pleading requirements that apply to derivative claims by operation of Mass.R.Civ.P. 23.1.[14] That rule requires, inter alia, that any complaint alleging a derivative action be verified, a requirement with which the plaintiff

---

[13]The plaintiff also separately pleaded a derivative claim on behalf of Scangas II. The defendants have not argued that that claim was improperly brought, and it is plain that she satisfied the requirements of Mass.R.Civ.P. 23.1, 365 Mass. 768 (1974), by pleading demand futility as to Scangas II.

[14]Both sides agree that a general partnership is an unincorporated association for purposes of rule 23.1. See *Allright Mo., Inc.* v. *Billeter*, 829 F.2d 631, 638 n.7 (8th Cir. 1987) (interpreting the parallel Federal rule).

indisputably failed to comply. The defendants argue that they preserved this issue by raising it in a timely manner, and that, in any event, the verification requirement is jurisdictional and therefore cannot be waived. We disagree on both points.

In their answers to both the original and the amended complaints, the defendants generally alleged as an affirmative defense that the "Plaintiff's complaint fails to meet the pleading requirements of Mass.R.Civ.P. 23.1." However, they did not file a motion to dismiss raising the verification issue, or otherwise flag it prior to (or even after) trial. Having proceeded through a full trial to determine the truth of the allegations set forth in the plaintiff's complaint, we believe that it is too late for the defendants to argue the point. See *Crowley* v. *Communications for Hosps., Inc.*, 30 Mass. App. Ct. 751, 766 n.20 (1991) (compliance with verification requirement of rule 23.1 waived where defendants did not object and allegations were verified at trial). See generally *Dumas* v. *Meyer*, 296 Mass. 57, 59 (1936) ("[p]urely formal objections" to complaint can be "waived by the defendant by going to trial on the merits").

Rule 23.1 also includes a presentment requirement as follows:

> "The complaint shall also allege with particularity the efforts, if any, made by the plaintiff to obtain the action he desires from the directors or comparable authority and, if necessary, from the shareholders or members, and the reasons for his failure to obtain the action or for not making the effort."

Thus, to satisfy rule 23.1, a complaint in a derivative action must plead with particularity either the presuit demand the plaintiff has made or the reasons why making such demand would have been futile.[15] See *Harhen* v. *Brown*, 431 Mass. 838, 844 (2000).

---

[15]As a result of a statute effective July 1, 2004, a plaintiff seeking to maintain a derivative suit on behalf of a corporation must in all cases first make a written demand on the board of directors and no longer can rely on the so-called "futility exception." See G. L. c. 156D, § 7.42, inserted by St. 2003, c. 127, § 17; *Johnston* v. *Box*, 453 Mass. 569, 578 n.15 (2009). The defendants argue, for the first time on appeal, that we should apply this "universal demand" requirement to derivative suits filed on behalf of

The requirement that a plaintiff in a derivative suit plead that demand was either made or excused "protects the court from unnecessarily hearing a case that is not ripe for decision or that might be mooted by subsequent board action[,] . . . provides an opportunity for the board to determine if it will pursue other remedies or take other appropriate corrective actions[,] . . . [and] permits the corporation to take over the suit and control the litigation." 2 ALI Principles of Corporate Governance: Analysis and Recommendations § 7.03 comment c (1994). In light of the central import of this requirement, we believe that a stronger case can be made against allowing a defendant to waive presentment than can be made as to verification. Nevertheless, based on cases that hold that analogous presentment requirements can be waived, we conclude that the presentment requirement applicable to derivative actions can be waived as well. See *Moran* v. *Mashpee*, 17 Mass. App. Ct. 679, 681 (1984) (presentment requirement of Massachusetts Tort Claims Act can be waived); *Lord* v. *Commercial Union Ins. Co.*, 60 Mass. App. Ct. 309, 317 (2004) ("The requirement of G. L. c. 93A, § 9[3], that the plaintiff forward a demand letter at least thirty days prior to the filing of a complaint alleging a c. 93A violation 'is not jurisdictional in the sense that a party cannot waive it' "), quoting from *York* v. *Sullivan*, 369 Mass. 157, 163 (1975).[16] Consistent with that case law, we note that where a defendant fails to assert his presentment rights and a case goes forward to trial, the main purpose that presentment serves already has been lost.

Having concluded that waiver is possible, we now turn to whether the plaintiff complied with her presentment obligations

partnerships. Compare *Stegall* v. *Ladner*, 394 F. Supp. 2d 358, 367 (D. Mass. 2005) (applying statute to mutual funds); *Halebian* v. *Berv*, 457 Mass. 620, 623 n.4 (2010) (applying G. L. c. 156D, § 7.42, to business trusts based on the recognized similarities of corporations and business trusts). We need not reach this argument, because the defendants have waived it. See, e.g., *Porter* v. *Treasurer & Collector of Taxes of Worcester*, 385 Mass. 335, 338 n.5 (1982).

[16]See also Renz *vs.* Carota, U.S. Dist. Ct., No. 87-CV-487 (N.D.N.Y. 1991), aff'd sub nom. *Renz* v. *Beeman*, 963 F.2d 1521 (2d Cir. 1992) ("The demand requirement of [the parallel Federal] Rule 23.1 is a condition precedent to the commencement of a shareholder's derivative action, and as such is subject to the equitable doctrine of waiver"); *Longanecker* v. *Diamondhead Country Club*, 760 So. 2d 764, 768-769 (Miss. 2000) (demand requirement under similar State rule subject to waiver).

and, if not, whether the defendants in fact waived them. The plaintiff never has claimed to have made presentment and instead relies on the "demand excused" prong of the "futility exception." See generally *Harhen* v. *Brown*, 431 Mass. at 844 (distinguishing between "demand excused" cases and "demand refused" cases). Therefore, the complaint should have pleaded with particularity why presentment to the members of SRA would have been futile, and in particular why a majority of those individuals were interested parties. *Id.* at 842-843 & n.5 (adopting definition of "interested" found in 1 ALI Principles of Corporate Governance: Analysis and Recommendations § 1.23 [1994]). The complaint included no allegations explaining why it would have been futile for the plaintiff to ask the members of SRA to remedy the alleged misdeeds.[17] In this respect, the complaint failed to satisfy the presentment requirement of rule 23.1, and therefore would have been subject to dismissal.

However, although the defendants included in their answer an affirmative defense that the plaintiff had failed to comply with the pleading requirements of rule 23.1, at no point prior to trial did they seek dismissal on such grounds either through a motion to dismiss, see *Johnston* v. *Box*, 453 Mass. 569, 578-579 (2009), or a motion for summary judgment, see *Cote* v. *Levine*, 52 Mass. App. Ct. 435, 443 n.12 (2001), and cases cited. Nor did the defendants raise the plaintiff's failure to plead the futility of making a demand on the members of SRA in the joint pretrial memorandum.[18] While the defendants briefly touched on the issue in their requests for rulings of law, they did not argue the issue in their summation. Then, when the judge unsurprisingly made no findings with respect to whether demand would have been futile, the defendants did not press the point in their extensive postjudgment motion to amend the judge's findings of fact.[19] In

---

[17]The complaint did allege the futility of making a demand on 330 Scangas LP based on the assertion that the individual defendants controlled 330 Scangas, Inc., the general partner of 330 Scangas LP. Nowhere, however, is there an allegation that demand on the members of SRA would have been futile.

[18]In that pretrial memorandum, the defendants did allude to demand futility, but only with reference to the derivative claim the plaintiff sought to bring on behalf of 330 Scangas LP.

[19]Had the defendants pressed the issue, the plaintiff no doubt would have argued that demand was excused because the evidence showed that a majority

all of these circumstances, we conclude that the defendants have waived the issue.[20]

(ii) *Derivative claim brought on behalf of 330 Scangas LP.* In count II of her complaint, the plaintiff alleged that the defendants breached the duties they owed to 330 Scangas LP as the beneficiary of the trust.[21] This claim purportedly was brought on behalf of 330 Scangas LP. The judge dismissed count II after concluding that the plaintiff had no standing to assert such claims. He reasoned as follows:

> "[The plaintiff] is neither a general partner nor a limited partner of 330 Scangas LP. The closest she gets is to be a partner of SRA which is the sole limited partner of 330 Scangas LP. This is not close enough to bring the claims she presses in Count II."

On appeal, the plaintiff argues that the members of SRA were in effect the ultimate beneficiaries of the trust,[22] and that denying her standing "exalts form over substance." *Zimmerman* v. *Bogoff*, 402 Mass. 650, 660 (1988).[23] We are not unsympathetic to the plaintiff's argument, and we certainly disagree with the

---

of the members of SRA "were alleged wrongdoers or under the control of such wrongdoers." See *Pupecki* v. *James Madison Corp.*, 376 Mass. 212, 218 (1978).

[20]On appeal, the defendants also argue that the plaintiff failed to "fairly and adequately represent the interests of the shareholders or members similarly situated in enforcing the right of the corporation or association." Mass.R. Civ.P. 23.1. They did not argue this point below, and we conclude that it was waived. Even had the issue not been waived, we would conclude that the defendants have not carried their burden on that defense. The fact that the plaintiff may have been alone in voicing her concerns about the defendants' alleged breaches of their fiduciary duties does not mean that she could not satisfy the rule's requirement.

[21]As the beneficiary of a nominee trust, 330 Scangas LP generally had authority to direct the actions of the trustees in conducting the trust's business. See *Roberts* v. *Roberts*, 419 Mass. 685, 687 (1995).

[22]In support of her argument, she notes that the judge found that viewing SRA as the beneficiary of the trust was "essentially true but not technically correct," and that the defendants themselves "always understood that SRA was the beneficiary of the Trust."

[23]In *Zimmerman* v. *Bogoff*, the defendant argued that his fiduciary duties were solely to his coshareholder and did not extend to the coshareholder's separate company. The Supreme Judicial Court rejected this formalistic argument in view of the intertwined relationships among all the various parties. 402 Mass. at 660-661.

defendants' assertions that it was impossible for them to violate any fiduciary duties in their administration of the trust's business on the theory that, given how they set up the relevant entities, they legally answered only to themselves. Nonetheless, we remain unconvinced that the plaintiff established her standing to maintain a derivative action on behalf of 330 Scangas LP in the circumstances presented.[24]

The Supreme Judicial Court recently reiterated that in order to maintain a derivative action, one must strictly retain an ownership interest in the company on whose behalf the action is brought. Cf. *Billings* v. *GTFM, LLC*, 449 Mass. 281, 290-294 (2007) (termination of ownership interests generally deprives derivative plaintiff of standing even where termination is involuntary). Although *Billings* is not directly on point, we believe it nevertheless highlights the importance of the requirement that a derivative plaintiff hold a direct interest in the entity on whose behalf she is purporting to sue.

We recognize that the Supreme Judicial Court has held that, in some circumstances, someone without a direct legal ownership interest in an entity nevertheless can possess sufficient standing to bring a derivative suit on behalf of that entity. See *Demoulas* v. *Demoulas Super Mkts., Inc.*, 424 Mass. at 516 (beneficiary of trust of shares found to have standing to bring shareholder derivative suit even though he was not legal owner of shares). In *Demoulas*, however, the plaintiff held a direct interest in the shares, albeit a beneficial interest. Cf. G. L. c. 156D, § 7.40, inserted by St. 2003, c. 127, § 17 (expressly defining "shareholder" — when used in subchapter that addresses shareholder derivative actions — to include "a beneficial owner whose shares are held in a voting trust or held by a nominee on the beneficial owner's behalf"). Here, the plaintiff's interest is more attenuated: she is merely a member of a general partnership that itself serves as the limited partner of the limited

---

[24]The plaintiff made no effort to raise the matter with the other SRA partners so as to get SRA itself to press its rights as the limited partner of 330 Scangas LP. While the defendants effectively were silent with respect to the plaintiff's failure to make a demand with respect to count I, they did to some extent press the plaintiff's failure to make a demand with respect to count II. See note 18, *supra*. Given our ruling on standing, we need not reach the question whether they adequately preserved this defense.

partnership on whose behalf she sought to bring the action (to recover damages done to a trust of which the limited partnership is the beneficiary). We agree with the judge that the plaintiff failed to demonstrate a sufficiently direct interest to have standing to bring such a derivative action.[25]

b. *The merits of the plaintiff's derivative claims.* We address first the plaintiff's argument that the judge's findings establish her entitlement to additional damages,[26] and then turn to the defendants' argument that the judge erred in providing the damages that he did.

(i) *The plaintiff's arguments.* The plaintiff makes various arguments that she is entitled to additional relief: (a) that the judge failed to identify certain fiduciary breaches supported by his findings; (b) that he too casually treated some fiduciary breaches as fully cured or otherwise de minimis; and (c) that he let some potential fiduciary breaches slide because he was unable to untangle some of the evidence (which she alleges amounted to improper burden-shifting). All of these variants evoke a common theme: that the judge failed to hold the primary defendants to the level of scrutiny applicable to those serving in a fiduciary capacity, and that she is entitled to a fuller accounting.

Armed mainly with general equitable arguments, the defendants argue the unfairness of a passive investor in a family enterprise (who has significantly profited from their management services) being allowed to require them after-the-fact to justify every transaction in which they faced a potential conflict of interest. It is evident that these equitable arguments swayed the judge to some extent,[27] and he made the following apt observation at the beginning of his lengthy decision:

[25]The plaintiff did little to develop the facts regarding the creation of 330 Scangas LP and the trust. For example, she failed to demonstrate how the trust acquired whatever assets it owned. Therefore, we have an insufficient basis for assessing the extent to which (if any) the creation of 330 Scangas LP and the trust effectively displaced SRA's ownership and control of its own assets.

[26]Because we agree with the judge that the plaintiff lacked standing to assert claims involving breaches of fiduciary duties owed to 330 Scangas LP, we need not address that subset of arguments that she raised regarding the primary defendants' administration of trust assets.

[27]For example, at one point in his decision, he observed, "It is often the case in a family enterprise that a small few are active in the management and creation of the enterprise while many others are almost wholly passive,

"Cases like this often include a curious blend of casual approach to technical niceties in the management of business structures and rigid insistence on those technical niceties when it supports a particular position. The Court is then asked to sort out the tangled mass of events occurring over many years and arrive at some legally and equitably correct resolution that the family itself has utterly failed to accomplish. The Court will attempt to seek an appropriate balance between applying legal principles and tempering the matter with those equitable concepts that should be applied under the circumstances. The result of that process may please none of the parties."

The question we face is whether the judge's blending of legal and equitable factors is consistent with the case law. We conclude that it is.

We begin by examining background principles. The Supreme Judicial Court long has recognized that a fiduciary who has engaged in transactions that involve self-dealing bears the burden of justifying the propriety of the transactions and the lack of resulting harm to those to whom he owed fiduciary duties. See, e.g., *Meehan* v. *Shaughnessy*, 404 Mass. 419, 441 (1989); *Starr* v. *Fordham*, 420 Mass. 178, 183 (1995); *Cleary* v. *Cleary*, 427 Mass. 286, 291 (1998). As the plaintiff accurately notes, the judge did find several specific instances of self-dealing (e.g., the commingling of funds). The plaintiff is also correct that the judge's findings demonstrate fairly pervasive potential conflicts of interest inherent in the defendants' management of the various entities (e.g., the fact that the primary defendants controlled the interest rate on the monies they lent to SRA and the trust). We therefore generally agree with the plaintiff that the defendants broadly bore the burden of justifying their actions and the lack of resulting harm.

It does not necessarily follow, however, that the plaintiff is entitled to the additional relief she claims. Although we agree that the defendants bore the burden of proving that transactions

contributing little, but gaining much from the work of others." After noting that the plaintiff fell into the latter category, he added: "This may not change the legal principles that apply, but to this Court at least, the point has some effect on the equitable view to be taken when the moment of compromise has evaporated."

from which they potentially stood to profit at the expense of SRA were "in all respects fairly and equitably conducted," *ibid.*, this principle does not prohibit a trial judge from considering the particular circumstances presented in weighing what is fair and equitable. For the reasons that follow, we conclude that the judge provided an appropriate level of scrutiny to the plaintiff's claims and that no further accounting is required.

As the experienced business litigation session judge observed, family business entities are typically operated in a decidedly looser manner than ordinary business entities.[28] The Supreme Judicial Court has emphasized the same point. See *Trager* v. *Schwartz*, 345 Mass. 653, 659 (1963) ("This was a small family corporation conducted without overemphasis on corporate formalities and reasonably is not to be held to the strict standards of larger commercial organizations"). The plaintiff profited handsomely under the loose arrangements through which the enterprises operated, even if the passive role that she played was not entirely of her choosing. Moreover, despite being content to gain from the expenditure of the primary defendants' time and effort in managing SRA, she insisted in the end that they not be compensated for those efforts.

Nevertheless, the judge carefully examined each of the defendants' alleged improprieties, and he held their feet to the fire on the big items. We discern no error in his declining to flyspeck every expense,[29] and we generally agree with his conclusion that the plaintiff received all the accounting to which she was entitled. His conclusion on this point is especially sound in light

---

[28]One of the ways that family enterprises can be different is that felt obligations sometimes overcome strict financial considerations. The primary defendants continued the social norms forged by the earlier generation in terms of making contributions to favored sources such as the family church, less fortunate family members, and certain former employees who had worked for the family for decades. Like the trial judge, we are "loath[] to fault these contributions," or to interfere with the decision to make them. As to the political contributions, the plaintiff did not show that these were anything other than the products of wise business decisions. The judge found that the primary defendants enjoyed no personal gain from the contributions.

[29]An illustrative example of the attenuated kinds of expenses for which the plaintiff claims she was inappropriately denied reimbursement is the money that the primary defendants theoretically saved by operating various businesses out of the same office as the trust, without such businesses separately paying a share of the insurance on the building.

of the decision the plaintiff made early in the litigation to reject the defendants' offer to open their books for an accounting by a neutral party.

(ii) *The defendants' arguments.* The judge ordered the primary defendants to reimburse SRA (and Scangas II) for the management fees they paid themselves (either directly or through entities they owned). We discern no error in this ruling. The SRA partnership agreement expressly prohibited the payment of management fees, and this provision never was amended. As the judge specifically found, in a finding that the primary defendants do not challenge, "The management fees were started, set and increased by [Arthur] Pappathanasi, Nicholas Scangas and Christopher Scangas, without consultation with, or approval of, the other SRA partners." Although the primary defendants have some argument that the plaintiff implicitly consented to the payment of the fees (given that such fees were, at least to some extent, disclosed in the annual financial reports without engendering objection),[30] we do not believe that the evidence of implied consent is sufficiently strong to overcome the express prohibition on such fees in the partnership agreement.[31] Nor do we see merit in the primary defendants' argument that the July 21, 2004, vote effectively ratified the past payment of such fees. Even assuming that ratification was possible, it would require a majority vote by neutral decision makers after full disclosure. See *Braunstein* v. *Devine,* 337 Mass. 408, 414 (1958). The defendants are unable to demonstrate this.[32]

Although we uphold the judge's decision ordering the primary defendants to reimburse the SRA management fees, we note

[30]See Bromberg & Ribstein, 2 Partnership § 6.02(g)(3), at 6:50.1 (Supp. 2009) ("An agreement to pay wages is often implied if wages are paid over a period of time and duly entered in the books without objection by the other partners, who are presumably familiar with the partnership books").

[31]The judge found that the primary defendants failed to prove that the other SRA members specifically acquiesced in the payments of the fees.

[32]The defendants also argue that a change in circumstances relating to the sale of the creamery warranted a change in the compensation provision, citing *Cadle Co.* v. *Vargas,* 55 Mass. App. Ct. 361, 365-366 (2002). However, the judge specifically rejected the factual basis of this argument. There is no merit to the defendants' separate statute of limitations argument, given that the management fee claims sound both in breach of fiduciary duty and in contract (for which a six-year statutory period applies).

that it leaves the primary defendants uncompensated for substantial services they unquestionably performed for SRA over the years. As noted, *supra*, we believe that this is an appropriate factor to be considered with regard to the scope of relief that the judge otherwise provided.

The judge's order also required the primary defendants to reimburse $37,000 in management fees related to Scangas II. This raises slightly different issues, because the limited partnership agreement that created Scangas II included no prohibition on the payment of such fees but instead was silent on the issue. Moreover, unlike the Uniform Partnership Act (see G. L. c. 108A, § 18[*f*]), the Revised Uniform Limited Partnership Act (RULPA) does not include an express provision barring compensation absent an agreement to the contrary.[33] However, the judge specifically found that "there is no evidence that the partners of [Scangas II] ever entered into any agreement authorizing such remuneration," and that finding is not clearly erroneous. We also note that any argument that the plaintiff implicitly consented to the primary defendants' paying themselves management fees is undercut by the fact that the relevant financial reports that had been sent to the plaintiff did not plainly disclose such payments. We therefore conclude that the judge did not err in ordering the primary defendants to reimburse Scangas II for the management fees they were paid.

The last argument that the defendants raise in their cross appeal is that the judge erred in concluding that a payment of $86,059.73 should have gone to SRA and not to Richdale. The defendants walk through the various transactional records, and offer a superficially plausible explanation as to why the money was in fact owed to Richdale. However, the inferences they ask us to draw from the documents are not the only ones possible, and the defendants failed to develop at trial how the records are to be read. There was some evidence that the money belonged

---

[33]The plaintiff nevertheless argues that § 18(*f*) of the Uniform Partnership Act is incorporated into the RULPA by the general provision in G. L. c. 109, § 62, inserted by St. 1982, c. 202, § 1, which states, "In any case not provided for in this chapter, the provisions of the Uniform Partnership Act as provided in chapter one hundred and eight A shall control." Given how we rule, we need not reach this issue.

to SRA, and the defendants have not demonstrated that the judge's finding regarding the Richdale payment is clearly erroneous.

4. *Attorney's fees.* Because she recovered some money on behalf of SRA, the plaintiff sought her attorney's fees out of the proceeds of that recovery. See *Martin* v. *F.S. Payne Co.*, 409 Mass. 753, 758 (1991). The plaintiff argues that the judge abused his discretion in denying her those fees and in refusing to entertain her fee application.

Attorney's fees are discretionary "and not a matter of strict right." *Coggins* v. *New England Patriots Football Club, Inc.*, 406 Mass. 666, 669 (1990). We believe the judge acted within his discretion in the circumstances presented. These include the fact that the plaintiff succeeded in her derivative action only as to a limited subset of the allegations she brought, and the fact that she truncated the prelitigation discussions that could have at least narrowed the dispute.

Nor do we see merit in the plaintiff's argument that the judge failed to provide her a sufficient opportunity to argue for her fees, or that he denied the fees without due consideration. In fact, the plaintiff argued at length why she was entitled to attorney's fees and costs in her proposed rulings of law, and later in her motion to approve the form of judgment. Having just sat through a two-week trial, the judge was familiar with the relevant considerations, and his decision not to entertain a separate application for attorney's fees and costs does not establish that he failed to exercise discretion.

5. *Interest.* We discern no merit in the plaintiff's argument that the judge was required to award interest on the damages she recovered from the date the breaches occurred, not the date that the complaint was filed. Her arguments are somewhat different with regard to the management fees than with regard to her other damages. As to the management fees, she argues that the defendants violated contractual obligations, and that she therefore should be allowed to rely on the more generous start date applicable to contract actions. See G. L. c. 231, § 6C. At least as to SRA, it is true that her claims to recover management fees could be characterized as sounding both in contract and as breaches of fiduciary duty (a tort-based theory). However, she herself pleaded the

claims as breaches of a fiduciary duty.[34] In these circumstances, we see no error in the judge's treating the claims under that rubric. See *Lattuca* v. *Robsham*, 442 Mass. 205, 210 (2004) (even where judge's findings referenced breach of contract theory, there was no error in his awarding interest only from date complaint was filed given that his "actual analysis concerning liability was based entirely on a breach of fiduciary duty, an action that sounds in tort").

The plaintiff does not make the same contract-based argument as to the other damages the judge awarded. Instead, she points to a line of fiduciary duty cases where the Supreme Judicial Court affirmed on appeal the award of prejudgment interest running from the date of breach. See *Production Mach. Co.* v. *Howe*, 327 Mass. 372, 378 (1951); *Demoulas* v. *Demoulas Super Mkts., Inc.*, 424 Mass. at 555-556; *Berish* v. *Bornstein*, 437 Mass. 252, 271 (2002). Although we agree with the plaintiff that these cases provide some support for awarding her interest from the date of breach, we do not view them as creating a mandatory rule to that effect. In sum, we do not believe the judge erred in awarding prejudgment interest only from the date the complaint was filed.

*Amended judgment affirmed.*

---

[34]Count I of the amended complaint alleged that the individual defendants violated their fiduciary duty to SRA by, inter alia, "receiving compensation for services provided to SRA." Count XI separately pleaded contractual violations of the SRA agreement, but it did not allege the payment of management fees as one of them.